# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 15, 2011 Session

## MARLA H., individually and as next best friend to her daughter
## MORIAH F. H. v. KNOX COUNTY, ET AL.

**Direct Appeal from the Circuit Court for Knox County**
**No. 1-688-05      Dale Workman, Judge**

---

**No. E2010-01705-COA-R3-CV-FILED-JUNE 29, 2011**

---

This is an action for negligent infliction of emotional distress. The mother of a middle school student filed suit against Knox County, the Knox County Board of Education, and the City of Knoxville after her daughter viewed graphic photographs of her dead father during a presentation on the dangers of drunk driving. The trial court found the City of Knoxville liable for the student's emotional injuries because the school resource officer who distributed the photographs intended to evoke an emotional response. We conclude it was generally foreseeable that providing graphic accident scene photographs to seventh grade students could cause serious or severe emotional harm in a student related to a victim depicted therein. Thus, the school resource officer owed a duty to exercise reasonable care when displaying the photographs to a class that potentially included students related to the victims. The evidence, however, preponderates against the trial court's finding that the school resource officer failed to exercise reasonable care. We reverse the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, J., and JOHN W. MCCLARTY, J., joined.

Lisa Belle Hatfield, Knoxville, Tennessee, for the appellant, City of Knoxville.

M. Christopher Coffey, Knoxville, Tennessee, for the appellees.

# OPINION

## I. Background and Procedural History

Marla H. ("Mother"), instituted this action individually and as next friend of her daughter, Moriah H. ("Moriah"), who at all times relevant to this appeal was a seventh grade student at Holston Middle School ("HMS") in Knoxville, Tennessee.[1] Moriah is the biological daughter of William Cabbage, a man whom she knew only as "Lynn" or "Daddy Lynn" Cabbage. According to the trial testimony, William Cabbage sexually molested Moriah when she was only four years old. As a result of the molestation, the Department of Children Services ("DCS") terminated William Cabbage's parental rights and placed Moriah in foster care. Moriah spent the next twenty-two months of her early childhood in various foster homes while Mother struggled to regain custody. Moriah had no face-to-face contact with her biological father subsequent to her removal.[2] The family, including Moriah, learned some years later that William Cabbage died in a car accident.

Mother immediately filed for divorce from Mr. Cabbage upon learning of his offense, but this did not prevent DCS from taking action against her. Mother explained DCS initially believed she either knew or should have known about the sexual abuse. Mother hired an attorney and successfully fought to regain custody of Moriah over an approximately two-year period. The young girl returned to the care of Mother at the age of six and resumed what Moriah described as a "pretty normal" life. Moriah appeared to suffer from no emotional problems, to have no trouble sleeping at night, and to exhibit no outward manifestations of post traumatic stress disorder following her return to Mother. Mother's current husband, Donnie H., later adopted Moriah and the State of Tennessee issued her a new birth certificate legally changing her last name. The record suggests Moriah's life stabilized after her return to Mother and she fared well without the aid of counseling or therapy. Mother went so far as to describe their life following her marriage to Donnie H. as a "fairytale ending."

Moriah's emotional well-being unfortunately suffered a setback on August 28, 2005, when Officer Roger White of the Knoxville Police Department gave a presentation on the dangers of alcohol use and abuse to a seventh grade health class. The presentation, which Officer White had given several times since 2002 without incident, included a lecture on the legal consequences of underage drinking and drunk driving, discussion of the physical risks of drinking alcohol, demonstration of how police administer a Breathalyzer test, and use of "fatal vision" or "beer" goggles to show the difficulty of completing even simple tasks when intoxicated. Officer White also circulated two envelopes containing accident scene photographs at the end of the presentation to show the real-life consequences of drunk driving. He arranged the photographs from least to most graphic, beginning with photographs displaying the wreckage and concluding with several gory, close-up photographs of corpses taken at the accident scenes of two alcohol-related fatalities and the

---

[1] We find it appropriate under the facts to identify the plaintiffs and Mother's new husband by their first names and last initials.

[2] Moriah testified there were pictures of William Cabbage at her house.

morgue. Officer White hoped the presentation would strongly impact the class, explaining he only had "one shot" to reach the students. Unbeknownst to Officer White, one of the envelopes contained photographs of Moriah H.'s biological father.

Kay Green, the health teacher who requested that Officer White give the presentation, testified he was "extremely careful in asking [her] opinion . . . about the class." She and Officer White had previously screened other students from the presentation when they anticipated a possible concern. In one instance, a student received alternative instruction in the library while the rest of the class viewed the presentation. In another instance, Ms. Green and Officer White questioned a student with the last name Cabbage to determine whether the student was related to William Cabbage. Officer Green took additional precautionary measures to avoid sharing the photographs with a student related to a victim which included placing the photographs in two envelopes bearing the names of the deceased, stating the names of the accident victims and describing the accidents in which they were involved, specifically identifying William Cabbage as one of the individuals depicted in the photographs, and asking whether any student in the class was related to Mr. Cabbage. Receiving no response, he circulated the photographs for viewing by those who chose to do so. Neither Officer White nor Ms. Green knew at that time Moriah H. was formerly known as Moriah Cabbage.

Moriah thought she might be related to William Cabbage when Officer White announced the photographs depicted an accident in which Mr. Cabbage was involved. According to the trial testimony, Moriah understood that "Cabbage" was once her last name, but she did not realize William Cabbage was her father because she knew him only as "Daddy Lynn" or "Lynn." She did not notify Officer White or Ms. Green that her biological father, a man with the last name "Cabbage," had died in an automobile accident and she did not excuse herself from the classroom. She instead remained in class and viewed the pictures despite understanding she had no obligation to do so. Moriah viewed the entire set of photographs depicting William Cabbage, later explaining she did not recognize the man in the photographs as her father because he was "unrecognizable."

Moriah initially found the photographs "disturbing," "nasty," and "gross" but did not show any outward signs of trauma or emotional distress. She instead continued about her day seemingly unaffected.[3] She only became shocked and upset when she learned William Cabbage was her biological father later that afternoon. During the car ride home from school, Moriah asked Mother about the identity of William Cabbage. Mother responded that William Cabbage was Moriah's biological father and asked why she was inquiring. Moriah replied, "Momma, because they showed some ugly pictures today . . . . They showed pictures today of William Cabbage in my class, and it was awful. He was in a pool of blood." At that point, Mother returned to school and demanded to see the pictures. Mother became very upset and later testified she would never have allowed Moriah to view such pictures—whether of William Cabbage or any other person—if given the opportunity to screen them. When they returned to their car after meeting with school officials, Moriah also became very upset and began to cry. Later that evening, she began experiencing hallucinations.

---

[3]The health class was the first of Moriah's school day. Classes ended at 3:30 in the afternoon.

On August 30, 2005, Moriah attended her first appointment with Patricia Lees, PhD, a licensed psychologist with a doctorate in counseling psychology from the University of Tennessee.[4] Dr. Lees described Moriah as "in shock, confused, [and] disoriented" during her initial assessment. Dr. Lees soon thereafter diagnosed Moriah as suffering from posttraumatic stress disorder ("PTSD"), and a lengthy course of treatment ensued. Dr. Lees also referred Moriah to Dr. Dovile Paulauskas, a Board certified child and adolescent psychiatrist at the Helen Ross McNabb Center in Knoxville who specializes in medication management. At her initial visit with Dr. Paulauskas, Moriah reported being traumatized after viewing very graphic pictures of a car accident involving her father. Moriah explained that following the incident she suffered from an inability to sleep, frequent nightmares, flashbacks, a fear of darkness, and on at least one occasion hallucinations. Upon further evaluation of the patient, Dr. Paulauskas diagnosed Moriah with PTSD and provided her with Lexapro and Trazodone to help alleviate some of the reported symptoms. Dr. Paulauskas determined after a period that continued medication management was unnecessary but recommended Moriah continue therapy. There is some suggestion Dr. Paulauskas believed Moriah's PTSD symptoms resolved near the end of their relationship, but the record is not entirely clear on this point.

Mother filed this action on behalf of herself and Moriah against Knox County, the Knox County Board of Education, and the City of Knoxville in December 2005. Mother asserted the defendants were liable under the Tennessee Governmental Tort Liability Act ("TGTLA"), Tennessee Code Annotated section 29-20-101, *et seq.*, for the injuries Moriah suffered as the result of the negligent acts or omissions of Knox County, the Knoxville Police Department, and Officer Roger White. The amended complaint alleged, *inter alia*, (1) it was reasonably foreseeable that a student who attended HMS might have a relationship with an individual involved in an alcohol-related fatality in Knox County; (2) Officer White failed to take reasonable steps to determine whether Moriah had a relationship to the individuals depicted in the photographs shown to her health class; (3) the City was negligent in failing to properly train and/or supervise Officer White regarding the publication of graphic photographs of alcohol-related fatalities to seventh grade students; (4) the County and the Board breached a duty of care owed to Moriah when it failed to investigate whether the photographs being shown depicted an individual to whom she was related; and (5) the County breached its duty of care by failing to obtain parental consent before publishing photographs of alcohol-related fatalities to Moriah's seventh grade class. According to the amended complaint, Moriah suffered both an invasion of privacy and severe physical, psychological, and emotional injuries as a direct result of the defendants' negligent acts and omissions.[5] The complaint sought compensatory damages against each defendant in an amount not less than $300,000, punitive damages in an amount not less than $500,000, reasonable attorney's fees, court costs, and discretionary costs.

---

[4]Mother suggested Moriah received psychological services from Dr. Lees while Mother was attempting to regain custody and the services ended when Mother completed the program. Dr. Lees, however, testified she only treated Mother at that time.

[5]The plaintiffs non-suited the invasion of privacy claim at the beginning of trial.

-4-

The City set forth several affirmative defenses in its answer. The City first contended it was immune from suit under the TGTLA. Even if the TGTLA removed immunity for the complained-of acts, the City asserted it could not be held liable for punitive or exemplary damages and, further, that the defendants were entitled to a bench trial. Additionally, the City alleged the damages the plaintiffs sustained, if any, resulted from the negligent or intentional acts of the plaintiffs, barring or reducing their recovery against the City under the doctrine of comparative fault.[6] Finally, the City alleged the damages sustained by the plaintiffs, if any, resulted from the negligent or intentional acts of another, likewise reducing or barring recovery against the City under the doctrine of comparative fault. The answer of the Board incorporated similar affirmative defenses.

The parties proceeded to a bench trial in April 2010. The witnesses who testified at trial included Mother, Moriah, Officer White, Ms. Green, and Thomas Brown, the principal at HMS. The plaintiffs also entered the depositions of Drs. Lees and Paulauskas as trial exhibits. Notably, the parties offered little proof about the educational appropriateness of Officer White's presentation. As the trial court explained in a lengthy memorandum opinion,

> Here we're talking about negligence. Negligence is the failure to exercise ordinary care. It is the doing of something which a reasonably prudent person in the same or similar situation would not do, or the failure to do something that a person in the same or similar situation would do under the same or similar circumstances. The problem uniquely we have here is what a reasonable person would do. We've talked about car wrecks. All of us have some experience driving cars, and it's not hard for all of us to figure out what people should do driving cars.

> But here we're talking about educating our young people. Is it not necessary to have some proof by someone who has knowledge in this field to establish what a reasonable prudent resource officer or teacher or whatever would do? Rather than leaving it to "Well, I think they were too gruesome." Some other judge might think they were not too gruesome, they were a good thing to do. One teacher says they're -- "Yeah, I understand they're a little gruesome, but we want to get their attention." The next teacher says, "Well, they're too gruesome." That's not what we're supposed to do. It's not supposed to be a variable situation. There's going to be some reasonable standard that every teacher should know or should be taught that they should do or not do -- or resource officer, as is this case.

> The problem the Court really has in this case was there was some recognition here of what's appropriate and what's not age-appropriate, as testified to. At the sixth grade, the teacher and the -- after consulting with the resource officer, would not think all the things should be done with sixth grade -- at the sixth grade; it should be done at the seventh or eight grade level because of the difference in age and

---

[6]The City does not argue on appeal that this Court should limit Moriah's recovery under the doctrine of comparative fault.

maturity of the kids involved. What is disturbing here is there's been no proof by anybody, including the City or the County, of some indication of what's educationally appropriate, what is effective, studies of -- nothing one way or the other, left it basically to this officer and the lady. The teacher says you've got to get these kids' attention because this is a terrible problem. The serious problem of underage alcohol use is undisputed. But this issue of drugs and alcohol at the seventh and sixth and fifth grade level even is a continuing and growing problem. But is this the way and what's too far is the question.

The trial court nevertheless determined upon the evidence presented that the plaintiffs established their claim for negligent infliction of emotional distress. The court reasoned:

> The problem here is the officer in question, the whole purpose of doing what he did and using these pictures is to cause an emotional reaction of the student, so, if you please, shock them enough where they'll listen to the message about what's going to happen. So the whole purpose is to evoke from the student an emotional reaction. Now, that's the whole purpose of how these pictures were used.
> . . . .
> [S]ince the point was to cause an emotional reaction, I don't think they should be surprised when it causes one. In this case, they should be aware that there are some kids, because of whatever's happened in their life, are going to react differently to an emotional event tha[n] other kids -- maybe 99 out of a 100 won't have a problem. But every now and then -- the Court is not unmindful that they see things on TV -- graphic, violent -- that are there, but in this case, the situation it created -- and I accept the doctors, that it triggered with this young lady some significant emotional reaction.

The court went on to conclude Officer White was negligent in "using these pictures not knowing what emotional reaction he would get from every student involved." As a result, the court awarded Mother $16,891.36 to compensate her for the medical bills Moriah incurred and an additional $50,000 in compensatory damages to be held in trust for Moriah until her eighteenth birthday.[7]

The trial court importantly did not find Ms. Green or any other employee of the County liable for Moriah's injuries. The plaintiffs argued the failure of Ms. Green and Officer White to present the alcohol awareness presentation to the appropriate administrators within the Knox County school system for screening formed a basis to hold both the City and the County liable. The City conceded Officer White and Ms. Green did not seek review of the presentation by the appropriate school administrators as required under the policies governing Knox County schools, the Knox County School Board did not review or approve the presentation, the school principal did not review or approve the presentation, neither Officer White nor Ms. Green advised parents that photographs of

---

[7]The City does not challenge the trial court's determination of damages.

deceased Knox County citizens would be shown in the health class, the parents were not provided an opportunity to view the photographs prior to the presentation, and the parents were not asked to consent to the display of the photographs. The City nonetheless contended the precautions Officer White took were reasonable under the circumstances.

The trial court agreed with the City and rejected the assertion that a Knox County policy requiring administrative approval for outside presentations established the standard of care for Ms. Green:

> The Court does not accept that their policy creates the standard of care. It's their policy. Without something more, we hope that they have a standard better than what's in every school system in the state of Tennessee or the country, that they have a set of policies requiring more than is the minimum requirement. But I don't know if that policy is the minimum or more than the minimum, because I don't have any record to tell me that.

The court also did not rely on Officer White's alleged breach of Knox County's policy "whereby outside speakers must seek permission from the Knox County schoo'ls (sic) central office to conduct student presentations" to hold the City liable. The court instead found only the City liable for Officer White's negligence in distributing the graphic photographs without knowing what reaction they might cause in each student. After the trial court denied the City's motion to alter or amend, the City timely appealed.

## II. Issues Presented

The City broadly presents the following issues, as we perceive them, for our consideration on appeal:

(1)     whether the Tennessee Supreme Court erred in *Sallee v. Barrett*, 171 S.W.3d 822 (Tenn. 2005), when it concluded governmental entities do not retain immunity under Tennessee Code Annotated section 29-20-205(2) from suits for injuries incurred as the result of a negligent infliction of emotional distress; and

(2)     whether the trial court erred when it concluded the plaintiffs proved the essential elements of their claim for negligent infliction of emotional distress.

The City's argument on the latter issue spans several elements of the plaintiffs' claim, creating additional sub-issues which we will address herein. Neither party presents as an issue on appeal whether the trial court erred in concluding the County was not liable for Moriah's emotional injuries or whether the court erred when it dismissed the claim against the Board. Also, the plaintiffs do not present as an issue on appeal whether the trial court erred when it concluded the policy of the Knox

County school system did not establish the standard of care owed by either Officer White or Ms. Green.

## III. Standard of Review

We review the judgment of a trial court in a bench trial *de novo* upon the record, according a presumption of correctness to the factual findings of the court below. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citation omitted). We will not disturb a trial court's finding of fact unless the evidence preponderates against its finding. *Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000) (citation omitted). The evidence preponderates against a trial court's finding of fact only where the record supports an alternative finding with greater convincing evidence. *Mosley v. McCanless*, 207 S.W.3d 247, 251 (Tenn. Ct. App. 2006) (citations omitted). Our review is *de novo* with no presumption of correctness where the trial court does not produce findings of fact. *Archer v. Archer*, 907 S.W.2d 412, 416 (Tenn. Ct. App. 1995) (citations omitted). We likewise review the trial court's resolution of legal questions *de novo* with no presumption of correctness. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000) (citation omitted).

## IV. Analysis

### *A. Immunity*

The first issue before this Court is whether the City is immune from suit for injuries arising out of a negligent infliction of emotional distress.[8] The City concedes the opinion of the Tennessee Supreme Court in *Sallee v. Barrett*, 171 S.W.3d 822 (Tenn. 2005), controls our decision. In *Sallee*, our supreme court explained after examining the history and structure of Tennessee Code Annotated section 29-20-205(2) (2000) that language retaining governmental immunity in cases involving "infliction of mental anguish" applies only to claims for intentional infliction of emotional distress.[9]

---

[8]The City notably does not contend that Mother erroneously designated her claim as one for negligent infliction of emotional distress or that the City is immune from suit under the facts because the asserted injuries actually arose out of an intentional or reckless infliction of emotional distress.

[9]Tennessee Code Annotated section 29-20-205 provides, in pertinent part:

Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of:

. . . .

(2) false imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with

(continued...)

*Sallee*, 171 S.W.3d at 829. Consequently, the *Sallee* court concluded a governmental entity does not retain immunity under the TGTLA against claims of negligent infliction of emotional distress. *See id.* at 831. The City argues the Tennessee Supreme Court incorrectly decided *Sallee* in "open conflict with the plain language and unambiguous meaning" of Tennessee Code Annotated section 29-20-205(2). The City, however, properly recognizes this Court's duty to apply controlling supreme court precedent and seeks only to preserve this issue in the event of further review. We accordingly affirm the decision of the trial court. Pursuant to *Sallee*, the City may be held liable on a claim for negligent infliction of emotional distress.

## B. Negligent Infliction of Emotional Distress

The second issue before this Court is whether the trial court erroneously found the City liable for negligent infliction of emotional distress. The existence of a "stand-alone" claim for negligent infliction of emotional distress is a relatively new phenomenon in Tennessee.[10] *See Estate of Amos v. Vanderbilt Univ.*, 62 S.W.3d 133, 137 (Tenn. 2001). Early Tennessee courts adhered to a version of the "physical manifestation" or "injury" rule used in various jurisdictions. *Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 528 (Tenn. 2008) (citing *Camper v. Minor*, 915 S.W.2d 437, 445 (Tenn. 1996); *Memphis State Ry. Co. v. Bernstein*, 194 S.W. 902, 902 (Tenn. 1917)). Tennessee plaintiffs historically could not recover for mental injury without an accompanying physical injury, physical consequence, or other independent basis for tort liability. *Estate of Amos*, 62 S.W.3d at 137 (citing *Laxton v. Orkin Exterminating Co.*, 639 S.W.2d 431, 433 (Tenn. 1982)). Although a plaintiff could recover for emotional damages which were "a 'parasitic' consequence" of negligence causing multiple types of damages, *id.* (citations omitted), a stand-alone claim for negligent infliction of emotional distress would not lie.

Experience, however, proved the "physical manifestation" or "injury" rule "inflexible and inadequate in practice," leading to its eventual rejection. *Camper*, 915 S.W.2d at 446. The fatal flaw of the rule was that it "ignore[d] the fact that some valid emotional injuries simply may not be accompanied by a contemporaneous physical injury or have physical consequences." *Id.* Strict adherence to the arbitrary line separating compensable claims on the basis of attendant physical injury inevitably gave way to "harsh results." *See* Daniel E. Wanat, *Infliction of Emotional Injury: The General Negligence Claim Within Serious or Severe Injury Limits As Proven by Medical or Scientific Evidence-the Tennessee Common Law Approach*, 36 U. Mem. L. Rev. 233, 234 (2006). Tennessee courts attempted to ameliorate the harshness of the rule over time "by either formally

---

[9](...continued)
contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights[.]

Tenn. Code Ann. § 29-20-205(2) (2000).

[10]Our supreme court "has defined a 'stand-alone' negligent infliction of emotional distress claim as a claim that seeks recovery only for emotional injuries and that is not accompanied by 'additional claims for damages.'" *Eskin v. Bartee*, 262 S.W.3d 727, 735 n.20 (Tenn. 2008) (citing *Estate of Amos*, 62 S.W.3d at 137).

creating exceptions to the rule or by applying the rule in a nonrigorous fashion." *Camper*, 915 S.W.2d at 445. The practice effectively diluted the "physical manifestation" or "injury" rule, *Eskin v. Bartee*, 262 S.W.3d 727, 734 & n.18 (Tenn. 2008), and created a confusing patchwork of "*ad hoc* exceptions," *Camper*, 915 S.W.2d at 445. The gradual weakening of the rule on a case-by-case basis provided favorable and just outcomes for some plaintiffs. But it also deprived the law of "'logic, consistency and fairness.'" *Camper*, 915 S.W.2d at 445; *accord Ramsey v. Beavers*, 931 S.W.2d 527, 530 (Tenn. 1996).

The Tennessee Supreme Court in *Camper v. Minor*, 915 S.W.2d 437 (Tenn. 1996), took up these concerns, acknowledging the inadequacy and inconsistency of the "rigid and overly formulaic 'physical manifestation' or 'injury' rule." *Camper*, 915 S.W.2d at 444–46. The *Camper* court expressed its desire to strike a more appropriate balance between two competing objectives: (1) "promoting the underlying purpose of negligence law—that of compensating persons who have sustained emotional injuries attributable to the wrongful conduct of others" and (2) "avoiding the trivial or fraudulent claims that have been thought to be inevitable due to the subjective nature of these injuries." *Id.* at 440. Our supreme court, after examining several potential approaches, found Tennessee courts should adhere to a "general negligence approach." *Id.* at 446. Justice Drowota, writing for the unanimous court, explained jurisdictions employing a "general negligence approach" had determined "negligent infliction of emotional distress cases should be analyzed no differently than any other negligence case; and that the proper application of the familiar elements of negligence is the preferable way in which to sort out the genuine from the false, the serious from the trivial." *Id.* at 443 (citations omitted).

The *Camper* court, however, did not limit the essential elements of a stand-alone claim for negligent infliction of emotional distress solely to the ordinary elements of negligence. The court set forth a test for liability requiring a plaintiff to make three showings in order to recover for negligent infliction of emotional distress. A plaintiff in Tennessee must (1) satisfy the five elements of ordinary negligence: duty, breach of duty, injury or loss, causation in fact, and proximate or legal cause, *id.* at 446 (citing *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993); *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993); (2) establish a "serious" or "severe" emotional injury, *id.* (citing *Burgess v. Superior Court*, 831 P.2d 1197, 1200 (Cal. 1992); *St. Elizabeth Hosp. v. Garrard*, 730 S.W.2d 649, 653 (Tex. 1987)); and (3) support his or her serious or severe injury with expert medical or scientific proof, *id.* (citing *Leong v. Takasaki*, 520 P.2d 758, 766–67 (Haw. 1974)). A "serious" or "severe" emotional injury is one that occurs "'where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.'"[11] *Id.* (quoting *Rodrigues v. State*, 472 P.2d 509, 520 (Haw. 1970))

_____

[11]"The 'unable to adequately cope' definition of serious or severe mental injury first appeared in *Rodrigues v. State*, 52 Haw. 156, 472 P.2d 509, 520 (1970)." *Eskin*, 262 S.W.3d at 735 n.21. "Tennessee is one of thirteen states currently using this definition." *Id.* n.21. Our supreme court recognized in *Eskin v. Bartee*, 262 S.W.3d 727 (Tenn. 2008), that at least "[o]ne knowledgeable commentator has characterized the definition as "unfortunate" and has called for its further refinement." *Id.* n.21 (citing John A. Day, *A Primer*

(continued...)

-10-

(citations omitted).

The overarching issue here is whether the plaintiffs satisfied the elements of negligent infliction of emotional distress set forth in *Camper*.[12] The City contends the plaintiffs did not meet their burden. The City argues Officer White did not owe a duty of care to the students of Ms. Green's health class, did not breach any duty of care owed to the students, and was not the proximate or legal cause of Moriah's emotional injuries. The principal contention in the City's brief is that it was wholly unforeseeable a student in the class would have:

> (1) been molested by her biological father when a small child; (2) been separated from her mother in the State foster care system as a result; (3) had no subsequent contact with the biological father, to the point of not recognizing him; (4) had such biological father who later died in an alcohol-related fatality; (5) not know her

---

[11](...continued)
*on the Law of Negligent Infliction of Emotional Distress*, Tenn. B.J., May 2005, at 28 n.5.). The concern is that courts might too narrowly define those circumstances under which a plaintiff may recover to exclude valid serious or severe mental injuries:

> Over the long run, most people can "cope" with almost anything. They may need therapy, they may need medication, they may need both, but they can "cope." Certainly the Court meant to permit recovery in cases where a person sought counseling or received medication, particularly if the counseling or medication was received over an extended period.

John A. Day, *A Primer on the Law of Negligent Infliction of Emotional Distress*, Tenn. B.J., May 2005, at 28 n.5. Although our supreme court in *Eskin* hinted it might consider recasting the terminology used in the serious or severe injury analysis to "more reliably differentiate between meritorious and non-meritorious claims," *Eskin*, 262 S.W.3d at 735 n.21, it did not reach the issue under the facts.

[12]The City does not contend that "objective gatekeeping rules" have been or should be incorporated into Tennessee's general negligence approach to negligent infliction of emotional distress which would prohibit the plaintiffs from recovering under the facts of this case. The Tennessee Supreme Court in *Eskin v. Bartee*, 262 S.W.3d 727 (Tenn. 2008), concluded a bystander who does not witness an injury-producing event must prove the following elements in order to recover for negligent infliction of emotional distress:

> (1) the actual or apparent death or serious physical injury of another caused by the defendant's negligence, (2) the existence of a close and intimate personal relationship between the plaintiff and the deceased or injured person, (3) the plaintiff's observation of the actual or apparent death or serious physical injury at the scene of the accident before the scene has been materially altered, and (4) the resulting serious or severe emotional injury to the plaintiff caused by the observation of the death or injury.

*Eskin*, 262 S.W.3d at 739 (footnote omitted). The bystander inquiry does not squarely fit the facts of this case and the City does not submit that other "objective gatekeeping rules," *id.* at 736, bar the plaintiffs' claims. Moreover, the City does not argue *Eskin* establishes a floor for liable conduct in negligent infliction of emotional distress cases. We correspondingly limit our review.

biological father's name or the circumstances of his death; (6) been legally adopted by a stepfather; (7) been issued a new birth certificate in a different name; (8) declined to report that she knew people by the last name Cabbage during the presentation, but attach such significance that she later asked her mother about the name; (9) actually viewed the first of the photographs of William Cabbage without any recognition, thus going on through the stack from less graphic to the most graphic pictures; and (10) then suffer the injury of delayed-onset post-traumatic stress disorder after her mother identified the photographed man as Miss [H.'s] biological father.[13]

The City further argues the plaintiffs failed to present reliable expert or scientific testimony establishing Moriah suffered a serious or severe emotional injury.

Duty of Care

The first issue before this Court is whether Officer White owed a duty of care to the students in Ms. Green's health class, including Moriah. The City contends only the "Knox County Schools," and not Officer White or the City, owed a duty of care to the students.[14] Additionally, the City argues Officer White did not owe a duty of care to protect Moriah against the risk of harm suffered in this case because her injury was unforeseeable. In the alternative, the City submits the trial court erred in holding Officer White to a different duty of care than the classroom teacher, Ms. Green. The plaintiffs respond that Officer White owed a duty of reasonable care to the students viewing the presentation similar to that imposed on school teachers, which he breached in two ways: (1) he made the presentation without submitting its content for screening and approval by the administrators of the Knox County school system, and (2) he failed to insure the presentation did not contain images depicting a gruesome death of a student's relative. We conclude Officer White owed a duty of care to the students to protect them from the foreseeable risk of serious or severe harm that might occur after viewing photographs of a relative's mutilated corpse.

---

[13]The City offers a somewhat scattershot argument on the issue of foreseeability, declining to distinguish between foreseeability as it relates to duty and foreseeability as it relates to proximate causation. The plaintiffs respond in kind. We cannot overly fault their approaches because the proper role of foreseeability in Tennessee law is constantly evolving. Further, as Justice Holder has noted, "[h]owever valid the distinction between general and specific foreseeability [when evaluating duty and proximate causation] may be in theory, the distinction is difficult, if not impossible, to apply in practice." *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 377 (Tenn. 2008) (Holder, J., concurring and dissenting). She has further suggested "these questions are so interrelated that they are virtually inseparable." *Id.* In her view, "any inquiry into the probability, likelihood, or foreseeability of harm, however the issue is framed, requires courts to draw overly fine distinctions and, worse yet, to encroach upon the proper function of juries." *Id.*

[14]The City cites no legal or policy justification for its position that only the "Knox County Schools" owed the students in Ms. Green's health class a duty of care. The only argument on this point is a single unsupported assertion, which is insufficient to preserve the issue on appeal. *See Bean v. Bean*, 40 S.W.3d 52, 55–56 (Tenn. Ct. App. 2000) (citations omitted).

"A duty of care is 'the legal obligation owed by [a] defendant to [a] plaintiff to conform to a reasonable person standard of care for the protection against unreasonable risks of harm.'" *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 819 (Tenn. 2008) (quoting *McCall*, 913 S.W.2d at 153); *accord Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997) (citation omitted) (concluding that typically "a person has a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to others"). Members of a civil society, as a general rule, must refrain from committing affirmative acts that a reasonable person should recognize as subjecting another to an unreasonable risk of harm or posing an unreasonable risk of invasion to another's interests. *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008) (citation omitted); *accord Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (citation omitted). "The core of negligence is the violation of this requirement by engaging in 'behavior which should be recognized as involving unreasonable danger to others.'" *Satterfield,* 266 S.W.3d at 355 (quoting W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 31, at 169 (5th ed. 1984)). And "the imposition of a legal duty reflects society's contemporary policies and social requirements concerning the right of individuals and the general public to be protected from another's act or conduct." *Bradshaw v. Daniel*, 854 S.W.2d 865, 870 (Tenn. 1993) (citations omitted).

"When the existence of a particular duty is not a given or when the rules of the established precedents are not readily applicable, courts will turn to public policy for guidance." *Satterfield,* 266 S.W.3d at 365. "Tennessee's courts use a balancing approach to determine whether the particular risk should give rise to a duty of reasonable care." *Id.* (citing *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 551 (Tenn. 2005); *Burroughs v. Magee*, 118 S.W.3d 323, 329 (Tenn. 2003)). Policy-based factors courts may consider include:

> (1) the foreseeable probability of the harm or injury occurring; (2) the possible magnitude of the potential harm or injury; (3) the importance or social value of the activity engaged in by the defendant; (4) the usefulness of the conduct to the defendant; (5) the feasibility of alternative conduct that is safer; (6) the relative costs and burdens associated with that safer conduct; (7) the relative usefulness of the safer conduct; and (8) the relative safety of alternative conduct.

*Id.* at 365 (citing *Burroughs*, 118 S.W.3d at 329; *McCall*, 913 S.W.2d at 153). "During the balancing process, it is permissible for the courts to consider the contemporary values of Tennessee's citizens." *Id.* at 366 (footnote omitted).

"While every balancing factor is significant, the foreseeability factor has taken on paramount importance in Tennessee."[15] *Id.* (citing *Hale v. Ostrow*, 166 S.W.3d 713, 716–17 (Tenn. 2005);

---

[15]Justice Holder has repeatedly criticized the use of foreseeability during the analysis of duty because it encroaches upon the role of the fact-finder. *E.g., Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 372 (Tenn. 2009) (Holder, J., concurring and dissenting); *Satterfield v. Breeding Insulation Co.,* 266 S.W.3d 347, 375 (Tenn. 2008) (Holder, J., concurring and dissenting); *Lourcey v. Estate of Scarlett*, 146
(continued...)

*Biscan v. Brown*, 160 S.W.3d 462, 480 (Tenn. 2005)). General foreseeability is now a threshold requirement in the duty analysis. *Giggers*, 277 S.W.3d at 365. "In order to determine whether a duty is owed in a particular circumstance, courts must first establish that the risk is foreseeable, and, if so, must then apply a balancing test based upon principles of fairness to identify whether the risk was unreasonable." *Id.* (citing *Satterfield*, 266 S.W.3d at 366). "This factor is so important that if an injury could not have been reasonably foreseen, a duty does not arise even if causation-in-fact has been established." *Satterfield*, 266 S.W.3d at 366 (footnote omitted) (citing *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992)).

It is important to recognize, however, that "[t]he role that the concept of foreseeability plays in the context of a court's determination of the existence and scope of a duty differs from the role the concept plays when the fact-finder is addressing proximate causation." *Id.* (footnote omitted). Courts evaluating foreseeability in the context of duty must take a more general approach to the likelihood of harm rather than determining the foreseeability of the specific harm suffered by the plaintiff. *See Satterfield*, 266 S.W.3d at 376 (Holder, J., concurring and dissenting); *see also Giggers*, 277 S.W.3d at 365 (stating that "no duty will arise when a risk of injury is not generally foreseeable").

> For a duty to exist, the defendant's "conduct must create a recognizable risk of harm to the [plaintiff] individually, or to a class of persons—as, for example, all persons within a given area of danger—of which the [plaintiff] is a member." Restatement (Second) of Torts § 281 cmt. c, at 4–5. However, because almost any outcome is

---

[15](...continued)
S.W.3d 48, 56 (Tenn. 2004) (Holder, J., concurring). In *Satterfield v. Breeding Insulation Co.,* 266 S.W.3d 347 (Tenn. 2008), for example, she argued that "[b]y incorporating foreseeability into an analysis of duty, the majority transforms a factual question into a legal issue and expands the authority of judges at the expense of juries." *Satterfield,* 266 S.W.3d at 376 (citation omitted) (Holder, J., concurring and dissenting). In her estimation, a "collection of twelve people representing a cross-section of the public is better suited than any judge to make the common-sense and experience-based judgment of foreseeability" and, thus, should retain primary responsibility for determining when a risk or harm is foreseeable. *Id.* (citations omitted). Justice Holder would therefore "eliminate foreseeability from the duty analysis entirely and conclude that a duty of reasonable care arises whenever a defendant's conduct poses a risk of harm to persons or property," which is consistent with the formulation of duty found in the Restatement (Third) of Torts. *Id.* at 377. "Under this approach, the existence of a duty generally would be presumed as long as the plaintiff has alleged that he or she was harmed by the defendant's conduct." *Id.* Courts, however, would retain authority to conclude no duty exists as a matter of law in rare instances where, despite the creation of a risk, "'an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases.'" *Id.* at 377–78 (quoting Restatement (Third) of Torts § 7(b)). While we agree that the current test for duty "forces trial judges to base their decision-making on a razor thin distinction," *id.* at 377, an opponent of Justice Holder's approach might argue it could impermissibly subject defendants to the whims of a jury in cases where negligence, as it is currently understood, is obviously lacking. Ultimately, the difficulty inherent in the current approach and any concerns regarding the proper role of the judge and jury in negligence cases are matters for our supreme court to consider. The highest court has made its decision, and we must adhere to precedent until it changes course or refines the current approach.

-14-

possible and can be foreseen, the mere fact that a particular outcome might be conceivable is not sufficient to give rise to a duty. For the purpose of determining whether a duty exists, the courts' consideration of foreseeability is limited to assessing whether there is some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it. In this context, the courts are not concerned with the ultimate reasonableness, or lack of reasonableness, of the defendant's conduct. Rather, the courts are simply ascertaining "whether [the] defendant was obligated to be vigilant of a certain sort of harm to the plaintiff."

*Satterfield*, 266 S.W.3d at 366–67. Courts may consider, "among other things, the presence or absence of prior similar incidents" when determining the foreseeability of an event. *Giggers*, 277 S.W.3d at 365 (citing *McClung v. Delta Square Ltd.*., 937 S.W.2d 891, 901 (Tenn. 1996)).

If the plaintiff demonstrates a risk of injury was generally foreseeable, courts must then examine the relevant public policy considerations to determine whether an enforceable duty existed at the time of the alleged breach. *Giggers*, 277 S.W.3d at 366 (citing *Satterfield*, 266 S.W.3d at 364–65). A duty of reasonable care typically will exist—and a risk of harm will be deemed unreasonable—where the foreseeability of the risk and the gravity of the potential harm outweigh the burden on the defendant to prevent the harm from occurring. *See Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 54 (Tenn. 2004) (citing *Wilder*, 913 S.W.2d at 153); *see also McCall*, 913 S.W.2d at 153 (stating that "[a] risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm"). "The foreseeability and gravity of the harm are linked insofar as the degree of foreseeability needed to establish a duty is inversely proportional to the magnitude of the foreseeable harm." *Satterfield*, 266 S.W.3d at 365 (citing *Turner*, 957 S.W.2d at 818). "The greater the risk of harm, the less degree of foreseeability is required." *Id.* at 365– 66 (citing *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 433 (Tenn. 1994)).

Tennessee courts have previously held that schools, teachers, and administrators owe a duty to exercise reasonable care to preserve the safety of their students.[16] *Haney v. Bradley Cnty. Bd. of*

---

[16]The general duty to use reasonable care owed by schools, teachers, and administrators likely does not extend to unforeseeable risks under the developing law of duty. This Court in *Mason ex rel. Mason v. Metro. Gov't of Nashville and Davidson Cnty.*, 189 S.W.3d 217 (Tenn. Ct. App. 2005), stated as follows:

Society places a significant responsibility upon school officials to provide a safe environment for our children, the students. However, such a responsibility does not make our school officials insurers of the safety of its students. To the contrary, teachers and school districts are not expected to be insurers of the safety of students. Moreover, Tennessee does not impose upon teachers the duty to anticipate or foresee the hundreds of unexpected student acts that occur in our public schools. This is particularly true when

(continued...)

*Educ.*, 160 S.W.3d 886, 897 (Tenn. Ct. App. 2004) (citations omitted); *Snider v. Snider*, 855 S.W.2d 588, 590 (Tenn. Ct. App. 1993). The trial court, when determining the existence and scope of the duties in this case, acknowledged teachers must typically adhere to a standard of reasonable care when dealing with their students in the classroom setting. The court thereafter concluded a school resource officer owes an analogous duty to act reasonably under the circumstances, impliedly equating the role of the school resource officer when giving a presentation to that of a school teacher lecturing on a sensitive topic. The question raised in this appeal is whether the imputation of a duty of care to a school resource officer under the facts is sound as a matter of law and policy. Because the existence of a duty of care is a legal question, our review is *de novo*. *See Lourcey*, 146 S.W.3d at 54.

We must first determine whether "some probability or likelihood of harm" existed that was "serious enough to induce a reasonable person to take precautions to avoid it." *Satterfield*, 266 S.W.3d at 367. Tennessee courts have "historically recognized that it is easily foreseeable that persons who have a close personal relationship with an injured party will suffer serious or severe emotional distress when they see someone 'near and dear' to them injured." *Eskin*, 262 S.W.3d at 738 (citing *Ramsey*, 931 S.W.2d at 529; *Shelton v. Russell Pipe & Foundry Co.*, 570 S.W.2d 861, 866 (Tenn. 1978)). Although an individual viewing a relative's mutilated corpse in accident scene photographs is not physically present at the scene, it is not difficult to imagine the photographs having a similar effect. Indeed, Officer White's prior actions when giving the same presentation demonstrate he recognized the risk inherent in displaying the photographs to a relative of the persons depicted. Officer White took specific precautions to ensure another student with the last name "Cabbage" was not related to William Cabbage. Further, he and Ms. Green also arranged an alternative lesson for another student who was related to an accident victim not depicted in the photographs.[17]

The expert testimony in this case further demonstrates a probability of harm existed for a student related to one of the accident victims. Dr. Lees testified to a reasonable degree of psychological certainty and in consideration of her fifteen years experience treating adolescents that showing graphic accident scene photographs to twelve-year-old students, much less a relative of the

---

[16](...continued)
injury results from conduct that constitutes a radical departure from reasonable conduct.

*Mason*, 189 S.W.3d at 221 (internal citations omitted). This Court went on to state that it had "no hesitation in holding a teacher or local school system to the duty of safeguarding students from *reasonably foreseeable dangerous conditions . . . .*" *Id.* at 224 (emphasis added) (citing *Roberts v. Robertson Cnty. Bd. of Educ.*, 692 S.W.2d 863, 872 (Tenn. Ct. App. 1985).

[17]We do not suggest the decision to take precautionary measures alone imposes a duty of care on the actor.

deceased, was "inappropriate" and "could have traumatized any twelve-year-old . . . ."[18]  Dr. Paulauskas's testimony supports this conclusion.  She testified to a reasonable degree of psychiatric certainty that the actual cause of Moriah's PTSD was "the trauma of seeing these pictures of the father. . . ."[19]  And she later expressly affirmed in her deposition that the source of the trauma was Moriah's viewing of the graphic pictures.  The City offered no expert evidence to rebut the testimony of either mental health professional.

In light of the record and arguments before us, we conclude it was generally foreseeable that a student in the class who unexpectedly viewed graphic photographs of a relative's mutilated corpse might suffer serious or severe emotional harm.  A sufficient risk of serious or severe emotional harm existed under the facts as to induce a reasonable person in Officer White's situation to adopt precautionary measures to prevent a seventh grader from viewing such pictures.  We decline, however, to find it was foreseeable that a student would suffer similar harm simply by viewing pictures of a graphic nature.  In doing so, we place emphasis on the scant evidence suggesting a reasonable person would expect such photographs to cause serious or severe mental injury in a normally constituted seventh grader, the fact that simply viewing the photographs was not the cause-in-fact for Moriah's injuries, and the fact that Officer White's presentation did not cause emotional injuries in any other student over the years.  We recognize the possibility that future plaintiffs might produce evidence warranting a different conclusion, but we find none here.

_____

[18]The trial court impliedly rejected the possibility that it was "the gruesome nature of the pictures themselves that caused [Moriah] any injury."  The court explained there was "no proof whatsoever that she was in any way overly emotionally distraught or overly upset or had any reaction to those pictures until after school."  The court added, "This [is] not just a problem related to her seeing these pictures.  This is a problem that brings back a molesting father and some other things that occur along the way."

[19]Dr. Paulauskas further opined with respect to Moriah that "what adds to her case is that was in fact her father who molested her when she was four years old."  She explained that Moriah's history of sexual abuse could have caused the pictures to affect the girl more profoundly than they might have affected another person, but she could not testify about any precise relationship between the two because she did not have any information about whether Moriah exhibited signs of PTSD after the molestation.  Dr. Lees also gave testimony suggesting the prior sexual abuse may have aggravated Moriah's injuries.  When asked whether Moriah's sexual abuse at the hands of her father would have any bearing on how profound her reaction would be to seeing the photographs, Dr. Lees responded:

I think it would have a profound impact because as I said, that relationship had been severed when she was very young.  She knew of the situation but had not -- really didn't have a lot of memories that she wanted to talk about about the sexual abuse, but having severed that relationship and knowing that that was her biological father and to then see him and his mangled body in pictures, I think, has brought of a lot of feelings, feelings that she had in terms of her feelings about him and also just the horrific way in which he died.

The parties, however, leave this Court to wonder precisely what role Moriah's prior sexual abuse played in the manifestation of her resulting emotional injuries.

The pivotal issue is consequently whether a duty of care should be imposed in light of the relevant balancing factors. We conclude it should. The evidence demonstrates the magnitude of potential emotional harm a student might suffer when unexpectedly viewing photographs of a deceased relative is high. The expert testimony suggests the usefulness of displaying the photographs is questionable.[20] It is quite feasible to send a similar message regarding the dangers of alcohol use to the students through less harmful means or to implement precautionary measures designed to screen students related to the accident victims. The relative costs associated with implementing such precautionary measures or creating an alternative presentation are *de minimis*. The relative usefulness of the alternative programs appears commensurate with that of the complained-of conduct in light of the expert testimony. And the relative safety of the alternative course of action is much enhanced. We therefore conclude Officer White owed a duty to take reasonable care when displaying the accident scene photographs to a class of students potentially related to the victims.[21]

We recognize that informing students of the dangers of drunk driving and alcohol abuse, even in students as young as twelve years old, is of ever-growing importance. Officer White testified at trial that in his substantial experience as a police officer he not only observed twelve-, thirteen-, and fourteen-year-olds drinking alcohol, but he had also seen children of the same age operating a vehicle under the influence. A survey conducted of Knox County high school students supported the officer's field observations. A report entitled "Risk Behaviors Among Knox County, TN Adolescents," which was derived from 861 responses to the 2005 Knox County Youth Risk Behavior Survey, states that approximately 22.7 percent of respondents had ridden in a vehicle driven by a person under the influence of alcohol, including 22.8 percent of ninth graders; 10.0 percent of respondents had driven after drinking alcohol, including 9.1 percent of ninth graders;[22] 67.6 percent of respondents had consumed alcohol at least once, including 61.2 percent of ninth graders; 34.4 percent of respondents had consumed alcohol within the past thirty days, including 25.9 percent of

---

[20]Dr. Lees and Dr. Paulauskas both testified they were unaware of any studies or literature suggesting that displaying graphic photographs of alcohol-related fatalities to seventh grade students would deter future behavior. The City similarly admitted Officer White "was aware of no studies or literature indicating that showing graphic photographs of decease[d] accident victims to middle school students would be an effective deterrent to prevent driving under the influence." Neither the experts' testimonies nor the City's admission forecloses the possibility that such studies or literature exists. Also, Ms. Green testified in her experience as a health teacher that she believed Officer White's presentation was an effective way to teach the drunk driving curriculum to seventh grade students.

[21]We need not address under the facts whether a school resource officer should generally possess a duty of care when performing a role mirroring that of a teacher. But we note our supreme court in *R.D.S. v. State*, 245 S.W.3d 356 (Tenn. 2008), concluded a school resource officer may, under the facts of any given case, occupy the role of school official whose "basic task is to educate students in a safe environment" rather than the role of a law enforcement officer whose "primary duty is to detect and deter crime." *R.D.S.*, 245 S.W.3d at 368.

[22]The report advises the reader to interpret the 9.1 percent figure with caution.

ninth graders; and 22.8 percent of respondents reported drinking five or more alcohol beverages in a single episode in the past thirty days, including 20.2 percent of ninth graders. Most alarmingly, 17.1 percent of respondents reported drinking alcohol (other than a few sips) before the age of 13, including 23.0 percent of ninth graders. We applaud Officer White, Ms. Green, and the Knox County school system for recognizing the importance of teaching young people about the dangers of alcohol consumption before it is too late. Given the failure of the City, however, to produce evidence demonstrating the effectiveness or appropriateness of displaying graphic photographs of alcohol-related fatalities to seventh graders, we cannot conclude this very important policy justification outweighs the risk of harm presented. We thus conclude Officer White owed a limited duty of care to the students in Ms. Green's health class when distributing the photographs.

We find the issue of whether the trial court held Officer White or the City to a duty of care different from the duty it attributed to Ms. Green or the County to be irrelevant. Neither party presents as an issue on appeal whether the trial court erred when it concluded the County should not be held liable. It is therefore unnecessary to consider whether the court should have imposed a greater duty on Ms. Green. Moreover, we read the trial court's decision as imposing an analogous duty of care on Ms. Green but concluding she did not *breach* the duty of reasonable care owed to her students under the facts. The court did not expressly differentiate between the duty of care the parties or their agents owed to the students. The court instead concluded neither Officer White nor Ms. Green's failure to seek approval of the presentation amounted to negligent conduct. It appears the court found no basis for holding the County liable for negligent infliction of emotional distress because Ms. Green did not personally distribute the photographs to the class. Whether the trial court erred when it concluded Ms. Green did not breach the standard of care she owed to the students by permitting Officer White to give the presentation is an altogether different issue, and one not presented for consideration in this appeal.

Breach of Duty

Having concluded Officer White owed a duty of care to protect students in Ms. Green's health class from the general harm associated with viewing graphic photographs of a relative's dead body, we proceed to the second issue before this Court: whether Officer White breached the duty of care. "Once it is determined that [a] defendant owed [a] plaintiff a legal obligation to conform to a reasonable person standard of conduct, *i.e.*, a duty—the question becomes whether [the] defendant failed to exercise reasonable care under the circumstances, *i.e.*, whether [the] defendant breached the duty." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). "What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty." *Id.* (citing W. Keeton, *Prosser and Keeton on the Law of Torts*, § 356 (5th ed. 1984)). Typically, a defendant must exercise ordinary or reasonable care. *See Patterson-Khoury v. Wilson World Hotel-Cherry Road, Inc.*, 139 S.W.3d 281, 285 (Tenn. Ct. App. 2003).

Ordinary or reasonable care is "the care an ordinarily prudent person would take under the circumstances." *Snider v. Snider*, 855 S.W.2d 588, 590 (Tenn. Ct. App. 1993) (citing *Hawkins Cnty. v. Davis*, 391 S.W.2d 658, 660 (Tenn. 1965)). "'Ordinary, or reasonable, care is to be estimated by

-19-

the risk entailed through probable dangers attending the particular situation and is to be commensurate with the risk of injury.'" *Patterson-Khoury*, 139 S.W.3d at 285 (quoting *McClung*, 937 S.W.2d at 895). In other terms, a defendant must take reasonable care in light of the apparent risks. *McCall*, 913 S.W.2d at 153 (citations omitted). As our supreme court has explained,

> "Negligence already has been defined as conduct which falls below a standard established by the law for the protection of others against unreasonable risk of harm. The idea of risk in this context necessarily involves a recognizable danger, based upon some knowledge of the existing facts, and some reasonable belief that harm may possibly follow. Risk, for this purpose, may then be defined as a danger which is apparent, or should be apparent, to one in the position of the actor. The actor's conduct must be judged in the light of the possibilities apparent to him at the time, and not by looking backward "with the wisdom born of the event." The standard is one of conduct, rather than of consequences. It is not enough that everyone can see now that the risk was great, if it was not apparent when the conduct occurred."

*Doe*, 845 S.W.2d at 178 (quoting 5 Prosser and Keeton, *The Law of Torts* § 31, p. 170 (1984)). A breach of duty exists only if the defendant has not exercised reasonable or ordinary care. *McCall*, 913 S.W.2d at 153–54 (citing *Doe*, 845 S.W.2d at 178). The question of whether a defendant breached a duty is an issue of fact. *Patterson-Khoury*, 139 S.W.3d at 285 (citing *Staples v. CBL & Assoc.*, 15 S.W.3d 83, 91 (Tenn. 2000); *Anderson v. City of Chattanooga*, 978 S.W.2d 105, 107 (Tenn. Ct. App. 1998)).

The trial court concluded Officer White was negligent because he circulated the photographs at issue "not knowing what emotional reaction he would get from every student involved." We think the trial court's conclusion places a burden on Officer White that surpasses the duty to exercise reasonable care in light of the apparent risks. We are mindful of the fact that Moriah was twelve years old at the time of the presentation. The age, experience, and judgment of a twelve-year-old student are factors a court should consider when determining the adequacy of the precautions taken to prevent harm. *See Hawkins Cnty. v. Davis*, 391 S.W.2d 658, 660 (Tenn. 1965) (holding a school bus driver owed a duty to exercise reasonable care "proportionate to the age of the child and its ability, or lack of ability, to care for itself" when entrusted with a child of tender years); *King by King v. Kartanson*, 720 S.W.2d 65, 68 (Tenn. Ct. App. 1986) (citation omitted) (stating that standard of reasonable care that teachers owe their students "must be determined with reference to the age and inexperience of the students, their maturity, and the dangers to which they may be exposed"); *Roberts v. Robertson Cnty. Bd. of Educ.*, 692 S.W.2d 863, 870–71 (Tenn. Ct. App. 1985) (finding a high school vocational teacher owed a duty to take precautions a reasonable person would take to protect shop students from an unreasonable risk of harm in view of, among other things, the age and experience of the students). We nevertheless conclude Officer White took reasonable care to avoid the apparent risk of inflicting emotional harm on a seventh grade student related to one of the accident victims depicted in his presentation.

Officer White took several affirmative actions to prevent a student related to one of the accident victims from viewing the photographs. He questioned Ms. Green about the students in the class to determine if any known risks existed. He appears to have reviewed the class roll for students with the same last name of the deceased. He told the students the names of the deceased. He described the nature of the accidents. He wrote the names of the deceased on the envelopes containing the photographs. He made sure every student in the classroom understood the nature of the photographs. He arranged the photographs in a manner that allowed the students to avoid viewing the more graphic photographs if they so desired. And he instructed the students to view the photographs only if they wished to do so. While Officer White could have gone a step further and sought parental consent before displaying the pictures, his conduct was reasonable in light of the apparent risks. The possibility that a student in the classroom would not know whether an individual was her father, would not raise her concerns with her teacher or the presenter, would not recognize her father in the photographs, would view each of the photographs, would later discover the photographs depicted her estranged biological father, and would consequently suffer serious or severe emotional harm was not an apparent risk of giving the presentation. We accordingly reverse the trial court's finding of breach.

## V. Conclusion

Officer White owed a duty to protect Moriah from the foreseeable risk of harm she might suffer when viewing graphic photographs of a deceased relative. Officer White nevertheless took reasonable precautions to prevent Moriah or any other student in the class from suffering the serious or severe emotional harm that might result from viewing graphic photographs of a relative's dead body. Thus, no breach of duty occurred and the plaintiffs have not established their claim for negligence. We as a result need not decide whether Officer White's actions were the proximate cause or legal cause of Moriah's injury, which does not arise unless a breach of duty has been proven. *See* Dan B. Dobbs, *The Law of Torts* § 180 (2000). It is also unnecessary to consider whether the plaintiffs presented expert or scientific evidence of a severe or serious mental injury. The decision of the trial court is reversed. We tax the costs of this appeal to the appellee, Marla H. individually and as next friend of Moriah H., for which execution may issue if necessary.


_____
DAVID R. FARMER, JUDGE

-21-