IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 30, 2025 Session

## JENIFER HUTCHERSON HALL, ET AL. v. ROBERTSON COUNTY, TENNESSEE

**Appeal from the Circuit Court for Robertson County**
**No. 74CC5-2021-CV-304  Kathryn Wall Olita, Judge**

_____

### No. M2025-00163-COA-R3-CV

_____

This appeal arises from a general claim of negligence stemming from a dog bite. The plaintiffs adopted a dog from an animal shelter owned and operated by the defendant, a governmental entity. The dog bit one of the plaintiffs shortly after adoption. The plaintiffs sued, claiming that the shelter had a duty to warn them of the dog's dangerous propensities but failed to do so. The defendant filed a motion for summary judgment. The trial court determined that the evidence did not create a genuine issue of material fact regarding the foreseeability of the incident, and therefore, the plaintiffs could not establish the defendant owed them a duty to warn. Accordingly, the trial court granted the motion for summary judgment. The plaintiffs appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and VALERIE L. SMITH, J., joined.

William Kennerly Burger, Murfreesboro, Tennessee, for the appellants, Jenifer Hutcherson Hall and James Howard Hall.

Mark Nolan, Jeff T. Goodson, and Jennifer G. Gaydon, Clarksville, Tennessee, for the appellee, Robertson County, Tennessee.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

On October 22, 2020, Robertson County Animal Control ("Animal Control")

responded to a request for impoundment at the home of Beth Dorris. Ms. Dorris requested the impoundment of a stray dog that was present outside of her home. Animal Control officers captured the dog without incident and transported it to an Animal Control shelter. Ms. Dorris filled out a portion of the "Animal Impoundment & Disposition Record." In the field labeled "REASON," she wrote, "Aggressive Dog (Stray)." She also certified that she did not own the dog and, to her knowledge, the dog had not bitten any person within the preceding ten-day period. Another portion of the form to be filled out by Animal Control employees had a section regarding the temperament of the dog. That field was left unmarked. The dog was a white and black pitbull terrier mix, weighed 57 pounds, and was given the name "Sweetie" by Animal Control. Sweetie remained at the shelter for 26 days, where she was observed by Animal Control employees and was eventually approved for adoption.

On November 17, 2020, James Hall visited the shelter in search of a dog for him and his wife, Jenifer Hall, to adopt. Mr. Hall reviewed the dogs housed at the shelter and noticed Sweetie "put [her] paws on the cage . . . and barked" at him. Mr. Hall spoke to an Animal Control employee and stated that Sweetie "seem[ed] to be aggressive" and they "probably need[ed] to put her down." The employee responded that Sweetie was "not aggressive . . . just kennel crazy."[1] Subsequently, Mr. Hall agreed to interact with Sweetie in a fenced-in area of the facility. While doing so, he knelt down, permitted Sweetie to approach him, and let her "st[i]ck her nose directly to [his] face without incident." Afterward, Mr. Hall agreed to adopt her. Mr. Hall took Sweetie home, and she acted as a "normal dog" that evening. However, she began to cough up clear liquid. He took her to a veterinarian, who prescribed her medication for "kennel cough." However, she continued to cough up liquid during the following night. Mr. Hall permitted the dog to lay on his lap for several hours until the morning. At that point, he took her back to the veterinarian and left her there for examination. She was later diagnosed with congestive heart failure.

While Sweetie was at the veterinarian, Mr. Hall returned to the shelter to collect certain complimentary items. He spoke with the Animal Control Shelter Operator and informed her that Sweetie had been diagnosed with congestive heart failure. She responded, "you should have seen her when we first got her . . . . she was holy hell." Afterward, Mr. Hall collected Sweetie from the veterinary clinic and took her home. He left her with Mrs. Hall and then proceeded to the pharmacy to collect Sweetie's medication. Shortly thereafter, Sweetie walked toward Mrs. Hall, who then extended her hands to pet her. Sweetie then attacked Mrs. Hall. She bit and clamped down on her arms and hands, causing puncture wounds, and destroying tissue. After approximately one minute, Sweetie stopped the attack and released her. She called Mr. Hall, who returned home and "put the dog down." He then took Mrs. Hall to the hospital, where she underwent extensive

---

[1] The employee later explained that the term "kennel crazy" refers to "dogs who simply want to get out of their kennels and, as a result, they exhibit attention seeking behaviors[.]"

treatment to control the bleeding.  Subsequently, she was required to undergo several rounds of rabies vaccinations and was recommended surgery to repair torn tendons.

On November 12, 2021, the Halls filed a complaint in the Robertson County circuit court against Robertson County, Tennessee ("the County").  The Halls brought a claim pursuant to the Tennessee Governmental Tort Liability Act ("the GTLA") in which they claimed that the County's immunity from suit was removed based on the negligent acts or omissions of its employees.  *See* Tenn. Code Ann. § 29-20-205.  They claimed that the County knew or should have known of Sweetie's dangerous propensities but failed to warn them of those propensities.  They asserted a "claim for negligent failure to warn[.]"[2]  The County filed an answer shortly thereafter.

The County filed a motion for summary judgment on June 26, 2024.  The County argued that the Halls could not prove the incident was reasonably foreseeable, and therefore, could not establish the element of duty in their negligence claim.  The County also argued that it was "insulate[d]" from liability by both the GTLA and the public duty doctrine.  The County submitted a statement of undisputed material facts, affidavits, and depositions to support its motion.  In the statement of undisputed facts, the County explained that impounded animals housed at the shelter are observed by Animal Control employees and evaluated on a daily basis.  This includes the animal being released from its cage and brought into the facility's office area for interaction with employees.  If the animal demonstrates aggressive behavior, Animal Control does not approve it for adoption, and it is instead euthanized or sent to a rescue organization.  The observations and interactions of all employees are considered, but the final decision is made by the Shelter Operator.[3]

The County included the affidavit of Randy Peach, one of the Animal Control employees who went to Ms. Dorris's home to impound Sweetie.  Mr. Peach stated that, when he arrived, Sweetie was "calmly sitting and/or lying in a corner near the garage door."  He used a device called a "catch pole" to apprehend Sweetie and stated that she acted in a manner "consistent with most stray dogs' response to being apprehended and impounded."  He observed Sweetie while she was at the shelter and claimed she never demonstrated any

---

[2] Notably, this case arises from a nontypical set of circumstances.  Typically, "the Dog Bite Statute" governs civil liability for injuries caused by dogs.  *See* Tenn. Code Ann. § 44-8-413.  However, this statute applies to "[t]he owner of a dog" whether that be a private owner or a governmental owner.  *Id.; see, e.g., Munoz v. Sepulveda*, No. M2024-01002-COA-R3-CV, 2025 WL 2603041, at *3 (Tenn. Ct. App. Sept. 9, 2025); *Greenlee v. Sevier Cnty.*, No. E2017-00942-COA-R3-CV, 2018 WL 1969330, at *3 (Tenn. Ct. App. Apr. 26, 2018).  Here, the owner is not the party against whom liability is sought, as the parties agree that the Halls were Sweetie's owners at the time of the attack.  Accordingly, the provisions of the Dog Bite Statute are not the basis for the Halls' claim.

[3] While the Halls did dispute a number of the County's proffered statements of undisputed facts, they admitted these facts related to Animal Control's process for evaluating animals and determining whether they are suitable for adoption.

- 3 -

behavioral issues or aggressive behavior. The County also provided the affidavit of Sharon Bowen. Ms. Bowen was the shelter's Office Manager at the time of the incident. Ms. Bowen has dwarfism and is four feet two inches tall. She stated that, due to her size, she is "typically cautious of being around large-breed animals" but "never felt afraid of Sweetie (who weighed 57 pounds)." She permitted Sweetie to be "brought to the front office area where she would lie next to [her] desk, and [she] would rub Sweetie's head." Ms. Bowen stated that she "never saw Sweetie exhibit any aggressive behaviors." Additionally, the County submitted the affidavit of Chelsea Perry, the Shelter Operator during the time at issue. She stated that she and other Animal Control employees observed Sweetie during her time at the facility. She claimed that Sweetie did not exhibit any behavioral issues or aggressive behavior. She even permitted her four-year-old son to interact with the dog and no issues arose. Based on her own interactions and the reported interactions of other Animal Control personnel, Ms. Perry approved Sweetie for adoption. The County argued that these facts demonstrated Animal Control did not have a duty to warn the Halls of Sweetie's dangerous propensities, because no incidents had occurred to place the employees on notice of those propensities.

The Halls responded to the motion for summary judgment. They relied on Mr. Hall's deposition testimony. During his deposition, Mr. Hall recounted his second visit to the shelter. During this visit, he informed Ms. Perry of Sweetie's congestive heart failure diagnosis. He stated that Ms. Perry responded, "you should have seen her when we first got her . . . she was holy hell." He acknowledged that Ms. Perry did not explain what she meant by this comment but claimed he "pretty much knew what [she] meant." He interpreted the comment as an indication that Sweetie was aggressive but acknowledged he could not "tell you what she was thinking." He stated that he had not observed Sweetie exhibiting aggressive behavior prior to the attack but noted Sweetie was only in their custody for a brief time. He described the attack as the "[m]ost bizarre thing" as there had been no warning or indication it would occur. However, the Halls claimed that Ms. Perry's comment demonstrated Animal Control employees knew of Sweetie's dangerous propensities prior to the adoption.

Additionally, the Halls pointed to the affidavit of Ms. Dorris. In the affidavit, Ms. Dorris recounted the incident leading to Sweetie's impoundment. She stated that she returned home during the evening of October 21, 2020. When she arrived, she "was met in the parking lot by a stray dog who . . . did not clear the way for [her] car[.]" She stated that her husband "distracted" Sweetie while she made her way into the house, as the dog was "growling, lunging and showing signs of aggressiveness," which made her uncomfortable. Subsequently, she saw Sweetie through a set of sliding glass doors, and she "continued to growl and lunge toward" her. The next morning, her husband left before her, and when she went to leave she "saw that the dog was still at [her] house and [ ] was too afraid to walk" to her car "due to the continued aggressiveness of the dog." She stated that she contacted her husband's business, and a worker came to assist her, but "the dog was too aggressive" and "he was not about to do anything." She then called Animal

- 4 -

Control, and two officers came and apprehended Sweetie. She stated that she felt "that if [she] had left the house, the dog would have attacked [her][.]" The Halls also pointed to "the charted, objective, documented information contained in the County's mandatory records." They claimed that these items demonstrated the attack was reasonably foreseeable and therefore, the County had a duty to warn them of Sweetie's dangerous propensities.

The trial court entered an order on the motion for summary judgment on January 8, 2025. The court held that, to the extent the claim was predicated on the negligent act or omission of a government employee acting within the course and scope of employment, sovereign immunity was "removed" pursuant to the GTLA.[4] However, the trial court also held that the Halls had "not come forward with information which create[d] a dispute of fact as to the foreseeable probability of Sweetie's attack." The trial court noted that, while Ms. Dorris had characterized Sweetie as aggressive in the impoundment form, she certified that she had no knowledge of her biting anyone. Additionally, it considered the statements from the various Animal Control employees that indicated Sweetie had not exhibited aggressive behavior while at the shelter. The court determined that the Halls had failed to demonstrate a genuine issue of fact existed as to the issue of foreseeability. Accordingly, the trial court granted the County's motion for summary judgment. The Halls filed this appeal.

## II. ISSUES PRESENTED

The appellants have presented the following issue on appeal, which we have quoted verbatim:

1. In view of the controlling authority, upon almost identical facts, set forth in the case of *Chase v. City of Memphis*, 971 S.W.2d 380 (Tenn. 1998), was the Trial Court correct in its granting of the County's request for summary judgment dismissal of the GTLA claim?

For the following reasons, the judgment of the trial court is affirmed.

## III. DISCUSSION

Our state rules of civil procedure provide that summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. "The moving party has the burden of proving that its motion satisfies these

---

[4] The trial court also held that the GTLA shielded the County from any claims pertaining to any misrepresentations made about Sweetie. This has not been challenged on appeal.

requirements." *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 88 (Tenn. 2000). As our Supreme Court has explained, "the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015). Regardless of whether the nonmoving party bears the burden of proof at trial on the challenged claim, "at the summary judgment stage, '[t]he nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.'" *TWB Architects, Inc. v. The Braxton, LLC*, 578 S.W.3d 879, 889 (Tenn. 2019) (quoting *Rye*, 477 S.W.3d at 265). When reviewing a motion for summary judgment, a court places its focus "on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced" at a future trial. *Rye*, 477 S.W.3d at 265.

The decision to grant or deny "a motion for summary judgment is a matter of law; therefore, our standard of review is *de novo* with no presumption of correctness." *Jackson v. Thibault*, No. E2021-00988-COA-R3-CV, 2022 WL 14162828, at *3 (Tenn. Ct. App. Oct. 25, 2022). In conducting this review, "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Rye*, 477 S.W.3d at 250. However, "the evidence must be viewed in a light most favorable to the claims of the non-moving party, with all reasonable inferences drawn in favor of those claims." *Rye*, 477 S.W.3d at 286. *See Cotten v. Wilson*, 576 S.W.3d 626, 637 (Tenn. 2019).

The decision to grant the motion for summary judgment in the present case arises from a general claim of negligence. As we have previously explained:

> [w]hen asserting a negligence claim, 'a plaintiff must establish (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause.' *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008) (citing *Naifeh v. Valley Forge Life Ins. Co.*, 204 S.W.3d 758, 771 (Tenn. 2006); *Draper v. Westerfield*, 181 S.W.3d 283, 290 (Tenn. 2005)). '[D]uty has become an essential element of all negligence claims, as well as a question of law to be determined by courts.' *Id.* (citing *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005); *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993)). Therefore, [a plaintiff's] claim must fail if [the defendant] did not owe him a duty.

*Hopper v. Obion Cnty. Sch. Sys.*, No. W2021-00805-COA-R9-CV, 2022 WL 2116482, at *3 (Tenn. Ct. App. June 13, 2022). Here, the trial court determined that the County negated

the element of duty, and the Halls did not "produce evidence that would call into question whether the County knew or should have known of Sweetie's propensity for violence." Therefore, it held that summary judgment was appropriate.

We have explained that "[d]uty is the legal obligation a defendant owes to a plaintiff to exercise reasonable care in order to protect against unreasonable risks of harm." *Nickelson v. Sumner Cnty. Bd. of Educ.*, No. 01A01-9807-CV-00375, 1999 WL 767813, at *2 (Tenn. Ct. App. Sept. 29, 1999) (citing *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). We have further explained that duty is "considered in relation to all the relevant circumstances, and the degree of foreseeability needed to establish a duty of care decreases in proportion to increases in the magnitude of the foreseeable harm." *Id.* (citing *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 433 (Tenn. 1994); *Doe v. Linder Constr. Co., Inc.*, 845 S.W.2d 173, 178 (Tenn. 1992)). Additionally, "[t]he nature and scope of a person's duty in a particular situation is a question of law to be decided by the court." *Id.* (citing *Blair v. Campbell*, 924 S.W.2d 75, 78 (Tenn. 1996); *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993)).

In the context of duty, whether the risk of injury was foreseeable must first be established. *Landry v. Sumner Cnty. Bd. of Educ.*, No. M2019-01696-COA-R3-CV, 2020 WL 3550052, at *5 (Tenn. Ct. App. June 30, 2020). This Court has explained that "'the foreseeability factor has taken on paramount importance in Tennessee.'" *Marla H. v. Knox Cnty.*, 361 S.W.3d 518, 532 (Tenn. Ct. App. 2011) (quoting *Satterfield*, 266 S.W.3d at 366). "General foreseeability is now a threshold requirement in the duty analysis." *Id.* (citing *Giggers v. Memphis Housing Auth.*, 277 S.W.3d 359, 365 (Tenn. 2009)). The answer to the question of foreseeability "is determined by examining whether 'a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable.'" *Landry*, 2020 WL 3550052, at *5 (quoting *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 820 (Tenn. 2008)). Thus, the determinative issue in this case is whether the dog's attack was foreseeable given the information shown to be available to the County.

The County asserted in its statement of undisputed facts supporting its motion for summary judgment that Animal Control employees observed Sweetie and never detected aggressive or violent behavior. It also claimed that employees were not aware of Sweetie having bitten someone or otherwise exhibiting behavior indicating she was likely to attack Mrs. Hall. The County supported these contentions with the affidavits of three Animal Control employees, the impoundment form, and the adoption agreement. These facts, if true, demonstrate that the Animal Control employees did not know or had no reason to know of the dog's dangerous propensity and therefore, did not owe the Halls a duty to warn. Accordingly, the burden shifted to the Halls to "set forth specific facts showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. *See Munoz*, 2025 WL 2603041, at *4. In their response below and on appeal, the Halls disputed whether Animal Control employees observed or knew of Sweetie's dangerous propensities and pointed to the

following three facts which demonstrate a genuine issue of material fact existed: (1) Ms. Dorris labeling Sweetie as aggressive on the impoundment form, (2) Ms. Dorris's description in her affidavit of the events leading to Sweetie's impoundment, and (3) Ms. Perry describing Sweetie as "holy hell." Based on this, they claim that a genuine issue of material fact exists as to whether the County breached a duty to warn them of Sweetie's dangerous propensities.

The Halls rely heavily on *Chase v. City of Memphis* to demonstrate that the County owed them a duty based on the information known to Animal Control at the time of the adoption. 971 S.W.2d 380 (Tenn. 1998). Specifically, they claim that the "almost identical facts" of *Chase* demonstrate "[t]he summary judgment dismissal should be reversed, with the case remanded in accordance with instructions consistent with the Tennessee Supreme Court ruling in *Chase*[.]" The Halls contend that the trial court's decision "has re-written the Supreme Court's elaborate discussion of when, and how, a county/municipality's 'duty to warn' arises, in the context of foreseeability." Given the extent to which the Halls rely on *Chase*, a brief review is helpful.

*Chase* was also a dog bite case involving a governmental entity, the City of Memphis. *Id.* at 382. The case involved two pit bulls that engaged in the following behavior: (1) biting their owner's hand resulting in an injury which required surgical repair, (2) attacking their owner's mother who was "lying on the floor warding off the [dogs] with a stick" when emergency personnel arrived, (3) attacking the owner's mother a second time, resulting in emergency personnel again responding and transporting her to the hospital for medical treatment for "bites to her face, head and arms," (4) burrowing beneath a wooden fence constructed by a neighbor and attempting to attack the neighbor's children resulting in complaints filed with the City's police department, (5) a second attack on the owner that resulted in temporary paralysis, and (6) the attack of another neighbor's dog resulting in the amputation of its leg. *Id.* The owner of the injured dog filed a vicious animal complaint, and the dogs were impounded by the City's animal shelter for evaluation. *Id.* During this impoundment, one of the dogs attempted to attack a shelter employee. *Id.* However, the shelter determined that "neither dog possessed an overtly aggressive behavior." *Id.* The shelter conducted "a vicious animal hearing" at which it appears that records of these incidents were not provided. It was determined that the dogs were not "vicious" but instead "dangerous." *Id.* As a result, the shelter issued a letter to the owner directing him to correct any fencing deficiencies on his property and to enroll the dogs in an obedience training program. *Id.* The letter indicated that failure to comply would result in immediate seizure of the dogs and set a deadline of 90 days for completion of the tasks. *Id.* Subsequently, animal shelter employees visited the residence twice to inspect the fencing. *Id.* at 383. During one visit, the owner acknowledged that he had not enrolled the dogs in an obedience program. *Id.* This never occurred, and the City "neglected to monitor the situation to assure further compliance." *Id.* After the 90-day mark had passed, the dogs mauled to death the neighbor who had filed the complaint. *Id.*

A wrongful death action was filed, and the action was eventually appealed to our State's Supreme Court to determine: (1) whether the shelter's negligence in failing to follow up on the order to enroll the dogs in obedience school was a discretionary function and (2) whether a discretionary function under the GTLA may be held to be "non-immune under the common law 'special duty' exception to the public duty doctrine." *Id.* The Court held that the acts of the shelter were operational in nature, and therefore, the City was subject to liability under the GTLA. *Id.* at 384. The Court also held that the animal shelter employees "affirmatively undertook" to protect the decedent by sending her a copy of the letter stating the fencing deficiencies would be corrected and the dogs would be enrolled in obedience training. *Id.* at 385. The letter also stated that if the owner failed to comply with these conditions, the dogs would be seized. *Id.* The City failed to act when the time in which the owner had to comply with the requirements expired. *Id.* The Court held that she relied upon this undertaking, and therefore, the special duty doctrine served as an exception to the public duty doctrine and the City could be held liable for damages. *Id.*

Turning to the Halls' reliance on this case, it can hardly be said that these are "almost identical facts." The dogs at issue in *Chase* were involved in six incidents that involved violence towards several people and another animal prior to their impoundment. *Id.* at 382. Subsequently, while impounded, one dog attempted to attack a shelter worker. *Id.* Conversely, Sweetie was involved in only one incident prior to her impoundment, which did not result in physical injury to a person or animal. Likewise, no such incident was reported while Sweetie was housed at the shelter. Additionally, this appeal does not involve the immunity provisions of the GTLA or the public duty doctrine. The trial court determined that the GTLA did not shield the County from liability based on the acts or omissions of the Animal Control employees. Further, while the County pointed to the public duty doctrine as an additional affirmative defense in its answer, there was no discussion of the doctrine in the trial court's final order because it determined that no duty existed, and therefore, did not reach that defense.[5] Further, while the Halls claim that "*Chase* is a detailed, elaborate review of [the] 'duty to warn,'" it does not contain a discussion of a duty to warn. In fact, the phrase does not appear in the opinion, as the governmental entity in *Chase* breached its duty when its employee failed to seize the dogs after the owner failed to comply with the conditions set forth in a letter. *Id.* at 384. Likewise, there is no discussion of foreseeability contained in the *Chase* opinion. *Id.* As stated above, the trial court's decision to grant the motion for summary judgment in this case was predicated on its determination that the County did not owe the Halls a duty to warn because the evidence presented did not create a question of fact regarding whether "the County knew or should have known of Sweetie's propensity for violence." The *Chase* opinion does not address these issues, and therefore, such stark reliance on it by the Halls is perplexing. Nonetheless, we will consider the Halls' claim that the facts set forth above

---

[5] The County references this argument in its appellate brief as an alternative ground of affirmance if we were to overturn the trial court's ruling that it did not owe the Halls a duty to warn.

demonstrate a genuine issue of material fact concerning whether the County owed them a duty to warn.

First, we consider the encounter leading to Sweetie's impoundment. The Halls rely on the affidavit of Ms. Dorris and her description of Sweetie's behavior prior to the arrival of Animal Control. The brief presents this claim as follows:

> [a]s the County's paperwork file confirms, this animal came into its control and possession as a result of a frantic call responsibly made from an (disinterested) individual named Beth Null Dorris. The day the animal was picked up by the County, Ms. Dorris had attempted to leave for work. She could not leave her residence, and could not get to her car, because of the violent, continuous aggression of 'Sweetie,' a stray that had appeared in her front yard, in a scene that brings the story 'Cujo' to mind. 'Sweetie' would not leave, and would attempt to attack Ms. Dorris as she tried to rush to her vehicle. After several attempts, she retreated to her house, and telephoned the animal control personnel, describing the relentless aggression of the dog. While the County records are scant and poorly-charted, the dog came into the facility with the label of 'aggressive.'

However, this recitation of the circumstances leading to the impoundment is not an accurate reflection of Ms. Dorris's statements in the affidavit.

As stated above, the brief claims Sweetie "would attempt to attack Ms. Dorris as she tried to rush to her vehicle. After several attempts, she retreated to her house[.]" However, Ms. Dorris's affidavit indicates that she did not attempt to walk to her car prior to calling animal control and certainly does not describe her making "several attempts" to do so. Similarly, the affidavit does not reference her "describing the relentless aggression of the dog" to Animal Control while requesting the impoundment. Rather, the affidavit says the person who initially attempted to help "advised [her] to call Robertson County Animal Control, which [she] did." The affidavit does not contain any information regarding Ms. Dorris's interactions with Animal Control or what she did or did not tell them about the encounter. Similarly, at oral argument, the Halls' counsel maintained that this constituted an "attack" contradicting the trial court's order, although he acknowledged it was not an instance of Sweetie "physically attacking" Ms. Dorris. Ms. Dorris stated in her affidavit, "if I had left the house, the dog would have attacked me," which itself is an acknowledgement that she was not "attacked." This is not to diminish her experience, but clearly, she did not sustain the type of injuries or attack that Mrs. Hall would later suffer. Likewise, Ms. Dorris later declared that, to her knowledge, the dog had not bitten anyone within the ten days preceding the request for impoundment.

Ms. Dorris does describe aggressive behavior in her affidavit. However, there is no evidence contained in the record demonstrating that Ms. Dorris "describe[ed] the relentless

- 10 -

aggression of the dog" when requesting the impoundment or otherwise informed Animal Control of that aggressive behavior. There is no mention of growling or lunging contained in the impoundment form, and neither Ms. Dorris nor Mr. Peach indicated that she informed Animal Control of this information during the phone call or the ensuing visit. Importantly, the affidavits of Ms. Dorris and Mr. Peach do not contradict one another. Mr. Peach stated that Sweetie was "calmly sitting and/or lying in a corner near the garage door" when he arrived. Ms. Dorris does not describe the disposition of the dog upon the arrival of Animal Control, stating only that "after some attempts they were able to capture the dog and take her away." Nothing in her statement contradicts Mr. Peach's claim that the dog was calm upon the arrival of Animal Control. Likewise, Mr. Peach stated that Sweetie acted in a manner "consistent with most stray dogs' response to being apprehended" and did not notice any oddly aggressive or violent behavior. Again, Ms. Dorris's affidavit is silent as to the details of Animal Control's apprehension of Sweetie. Therefore, while the affidavit does indicate that Sweetie displayed some amount of aggression that was observed by Ms. Dorris, the Halls have failed to make the critical connection of that fact to the knowledge of Animal Control employees. *See A.M. by Amanda M. v. Masek*, No. W2024-01412-COA-R3-CV, 2025 WL 2701750, at *11 (Tenn. Ct. App. Sept. 23, 2025) (explaining a defendant's admission that she did not intend to leave a child alone with the dog that later attacked him did not demonstrate a knowledge of the dog's dangerous propensities because there was no evidence indicating the "decision was in any way based on a fear that the dog at issue was dangerous" and claims otherwise did not rise above the level of "speculation"); *see also Needham v. Gerwig*, No. E2023-00394-COA-R3-CV, 2024 WL 227810, at *6 (Tenn. Ct. App. Jan. 22, 2024) (affirming the grant of summary judgment where the plaintiff failed to "make the critical connection" that the defendant's dog was the dog which caused his biking accident). [6] Because the affidavits do not conflict and no evidence demonstrates that any violent behavior was observed or made known to the Animal Control employees during or after this encounter, the affidavit does not create a genuine issue of material fact.

Turning to the information contained on the impoundment form, it is undisputed that Ms. Dorris wrote "Aggressive Dog (Stray)" on the form immediately after the incident. The Halls characterize this as "charted, objective, documented information." Later, the

---

[6] As stated above, this case is atypical for one arising from a dog bite, as the Dog Bite Statute is not the basis for liability. However, we do find the analysis of courts applying certain sections of the Dog Bite Statute to be instructive. Section (c)(1) of the Dog Bite Statute is applicable where "a dog causes damage to a person while the person is on residential, farm or other noncommercial property, and the dog's owner is the owner of the property, or is on the property by permission of the owner or as a lawful tenant or lessee[.]" Tenn. Code Ann. § 44-8-413(c)(1). In such cases, the claimant is "required to establish that the dog's owner knew or should have known of the dog's dangerous propensities." *Id.* Here, the Halls similarly claim that the County had a duty to warn because it knew or should have known of Sweetie's dangerous propensities. Accordingly, while the analysis of other courts assessing whether a defendant had notice of a dog's dangerous propensities has been undertaken in a slightly different context, the analysis is helpful for our present purposes.

- 11 -

Halls' brief alleges that the County could have "simply told [them] that [it] had elected to label the animal as 'aggressive,' based on Ms. Dorris'[s] frantic encounter." However, this information was neither "objective" nor an election of the County. Rather, it was the subjective assessment of Ms. Dorris. At oral argument, counsel for the Halls acknowledged that Ms. Dorris's labeling of Sweetie was "subjective as can be." Further, there is a section of the form in which Animal Control is permitted to label the dog's disposition, and that field went unmarked. Accordingly, the County did not elect to label Sweetie as aggressive. Rather, Ms. Dorris did so when completing the intake form. Notably, it is undisputed that Animal Control's policy is for employees to interact with and observe a dog for several days. After that observation, the director decides whether the dog should be eligible for adoption. There has been no policy provided demonstrating that the statement of a non-employee on an intake form creates the type of presumption the Halls submit on appeal. That is not to say that the form carries no weight as evidence, but it is simply not "charted, objective, documented information" beyond its explanation of Ms. Dorris's stated reason for requesting impoundment and certainly does not represent a conclusion of the County.

It is also undisputed Ms. Dorris stated that, to her knowledge, Sweetie had not bitten anyone. Meanwhile, there is nothing on the form explaining what conduct led Ms. Dorris to conclude Sweetie was aggressive or otherwise demonstrating Sweetie engaged in behavior indicative of a propensity to attack or bite people. As such, this form alone would not have placed a reasonable person on notice of the probability that Sweetie was likely to attack and/or bite someone. The impoundment form is simply not sufficient to establish that Animal Control employees knew Sweetie was dangerous or might bite someone given the totality of the evidence. *See Searcy v. Axley*, No. W2017-00374-COA-R3-CV, 2017 WL 4743111, at *7 (Tenn. Ct. App. Oct. 19, 2017) (explaining that evidence demonstrating the defendants "had notice that their dog might jump on or scratch" the child was not "sufficient to show that the [defendants] were on notice, constructive or actual, that their dog would bite" the child).

Lastly, we consider Sweetie's behavior while housed at the shelter. The affidavits of three Animal Control employees are contained in the record. The affidavits indicate that the Animal Control employees observed and evaluated Sweetie during her 26-day stay at the facility and did not observe violence, aggression, or other behavior indicating she had a propensity for violence. Ms. Bowen stated that, despite her usual aversion to large animals, she was never afraid of Sweetie. Similarly, Ms. Perry stated that she permitted her young child to interact with Sweetie and no issues arose. The Halls attempt to controvert these affidavits only through citation to Ms. Perry's statement that the dog was "holy hell" during the first days of its stay. However, this comment alone is not sufficient to create an issue of fact regarding whether Animal Control employees were on notice of any violent propensities. Mr. Hall admitted that he did not know "what [Ms. Perry] was thinking" when she made this comment. While he claimed that he believed he "pretty much knew what [she] meant," there is not any evidence contained in the record indicating

- 12 -

the comment related to aggressive or violent behavior. Mr. Hall's statement does not reach beyond the realm of speculation, and "does nothing more than create 'metaphysical doubt' as to the material facts" because there was no evidence connecting this statement to a demonstration of violent tendencies. *See A.M. by Amanda M.*, 2025 WL 2701750, at *11 (quoting *Rye*, 477 S.W.3d at 265). Notably, this comment was made in response to a discussion of Sweetie's recent congestive heart failure diagnosis, not during a discussion of any issues of violence or aggressive behavior. The Halls did not depose Ms. Perry to explain the comment or her basis for making it. As stated above, a court places its focus "on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced" at a future trial. *Rye*, 477 S.W.3d at 265. This comment, alone, does not create a genuine question of material fact sufficient to reverse the decision to grant summary judgment.

"Based upon the totality of the evidence" we cannot conclude that the evidence cited by the Halls creates a genuine issue of material fact as to whether Animal Control employees knew or should have known Sweetie was dangerous or was likely to bite Mrs. Hall. *See Searcy*, 2017 WL 4743111, at *7. It is undisputed that the Animal Control employees were tasked with observing and monitoring Sweetie while she was impounded and Ms. Perry was responsible for determining whether adoption was appropriate. The affidavits of three Animal Control employees indicate that no signs of violence were observed while Sweetie was at the shelter. The dog was permitted to spend time outside of its kennel and in the presence of a child without incident. Further, Ms. Bowen stated that she had no issues interacting with Sweetie despite her being cautious around large animals due to her size. Conversely, the evidence submitted by the Halls has not been connected to the knowledge of Animal Control employees or is simply insufficient to create a genuine issue of material fact. No evidence sufficient to create more than a "metaphysical doubt" of the facts has been presented, and therefore, the Halls' evidence was insufficient to establish their negligence claim. *Rye*, 477 S.W.3d at 265. Accordingly, we affirm.

## IV. CONCLUSION

For the foregoing reasons, the ruling of the circuit court is affirmed. Costs of this appeal are taxed to the appellants, Jenifer Hutcherson Hall and James Howard Hall, for which execution may issue if necessary.

s/ Carma Dennis McGee
CARMA DENNIS MCGEE, JUDGE

- 13 -